UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RODOLFO JEREZ-SOSA,

Petitioner,

v.

JEFFREY UTTECHT,

Respondent.

Case No. C17-1670-RAJ-JPD

REPORT AND RECOMMENDATION

INTRODUCTION AND SUMMARY CONCLUSION

This is a federal habeas action brought under 28 U.S.C. § 2254. Petitioner Rodolfo Jerez-Sosa challenges in his petition a 2014 judgment and sentence of the King County Superior Court. Respondent has filed an answer to petitioner's petition together with relevant portions of the state court record, and petitioner has filed a response to respondent's answer. This Court, having reviewed petitioner's petition, all briefing of the parties, and the balance of the record, concludes that the petition should be denied and this action should be dismissed with prejudice.

FACTUAL/PROCEDURAL HISTORY

The Washington Court of Appeals, on direct appeal, summarized the facts of petitioner's crime, and relevant testimony presented at trial, as follows:

Around 10:30 p.m. on September 7, 2012, Yellow Cab driver Fasil Berhanu drove to Safeco Field after a Seattle Mariners game had just ended. Two men, later identified as Asuan Santos-Valdez and Rodolfo Jerez-Sosa, hailed his cab. Santos-Valdez told Berhanu to drive to Beacon Hill.

When Berhanu reached the intersection of Beacon Avenue South and 13th Avenue South, Santos-Valdez told Berhanu to turn left and park. After he stopped, Santos-Valdez told Berhanu, "Just give me everything, . . . whatever you have." When Berhanu turned around, Santos-Valdez said, "Just give me the money." Santos-Valdez then hit Berhanu in the face with a gun, breaking his cheekbone. Berhanu gave Santos-Valdez his wedding ring, his watch, and some cash.

Santos-Valdez told Jerez-Sosa to "[t]ake everything." Jerez-Sosa took Berhanu's wallet, two cell phones, and a bag containing Berhanu's for-hire license and Good To Go! toll pass from the front passenger seat. Jerez-Sosa also took Berhanu's keys and sunglasses from the center console, pulled out the wires connecting the radio and dispatch computer, and obscured the cab's security camera with the sun visor.

Bystander David Mitchell saw Berhanu "being robbed or being beaten up" by Jerez-Sosa and Santos-Valdez. Mitchell called 911.

The State charged Jerez-Sosa and Santos-Valdez with robbery in the first degree. Santos-Valdez entered into a plea agreement. As part of the agreement, Santos-Valdez agreed to testify against Jerez-Sosa. The State amended the information to charge Jerez-Sosa with robbery in the first degree while armed with a firearm. Jerez-Sosa notified the State that he intended to assert a duress defense based on the testimony of forensic psychologist Dr. Delton Young that Jerez-Sosa suffered from post-traumatic stress disorder (PTSD).

. . . .

Berhanu testified that Santos-Valdez and Jerez-Sosa spoke to each other in a "normal tone" of voice during the cab ride. Berhanu did not hear Santos-Valdez raise his voice or make any threats to Jerez-Sosa, nor did he see Santos-Valdez point a gun at Jerez-Sosa. Berhanu testified that Jerez-Sosa did not appear scared or frightened. Berhanu said they were "working together."

Mitchell testified that Jerez-Sosa and Santos-Valdez "took off running together" and "raced up" a nearby staircase. Mitchell stated that as Jerez-Sosa and Santos-Valdez ran off, the two men were "a foot or two" apart and appeared to be together. Mitchell also testified Santos-Valdez did not point a gun or make any threatening gestures at Jerez-Sosa.

. . . .

During direct examination, Santos-Valdez testified he had been friends with Jerez-Sosa, Oreste Duanes-Gonzales, Lazaro Valle-Matos, and "Jorge" since they were teenagers living in the same foster home. Santos-Valdez said that on the day of the robbery, the five men were driving around "pretty much looking for a victim and somebody to rob money." Santos-Valdez explained, "We was looking for a victim to rob since – first of all, the gun was not even – it didn't even belong to me, it belonged to them, and we was going to – the plan – well, we actually came up with a plan first."

In response to Santos-Valdez's testimony, "We wanted to – I'm kind of confused here, because I don't know if I [am] supposed to say this, but we was actually going to rob something different," the prosecutor said, "Okay." Santos-Valdez testified, "We was going to –" and defense counsel objected. The trial court overruled the objection. Santos-Valdez then testified, "Okay. [Jerez-Sosa] wanted to rob the liquor store and I didn't agree. <u>He said that he got away with robbing liquor stores before and he was successful at it</u>, but –." Defense counsel objected as Santos-Valdez said, " – I didn't want to do it." The trial court again overruled the objection. Santos-Valdez said, "We end[ed] up not doing it." Santos-Valdez testified the men "came up with a plan" to go to Safeco Field.

> So somebody mentioned in the van the taxi. Since it wasn't a busy day, the Mariners was playing, so it's pretty busy, they got money. So we all agree and we come up – we come up with a plan that me and him was going to be dropped off in downtown Seattle by the Safeco Field [by] Lazaro and Oreste and Jorge.

Santos-Valdez described how he and Jerez-Sosa planned to take a cab from Safeco Field to the Lago Vista Apartments in Beacon Hill where there was a dark street with stairs nearby.

> There's stairs, so we could actually rob them, rob the taxi cab there, take his keys, his phones, whatever, and then run towards the stairs, which [are] really dark. He wouldn't – he couldn't – he wouldn't have been able to see what way we went.

According to Santos-Valdez, Jerez-Sosa agreed to the plan and never indicated any reluctance to commit the robbery. Santos-Valdez testified that during the cab ride, Jerez-Sosa called Duanes-Gonzales and Valle-Matos to confirm they were waiting in the getaway car. Jerez-Sosa spoke in Spanish so that Berhanu would not understand what he was saying. As Santos-Valdez pointed the gun at Berhanu, Jerez-Sosa got out of the back seat and went to the driver's side to "block the door so the guy wouldn't be spooked and just run out of there." Santos-Valdez testified that Jerez-Sosa "took the keys out of the car, he

broke the radio, the things that you use to – what it's called, the walkie-talkie or whatever, he broked [sic] it." Santos-Valdez said Jerez-Sosa "on his own . . . blocked the camera with that sun thing. . . . It was something that he seen on his own and he covered." Jerez-Sosa and Santos-Valdez then fled "together." Santos-Valdez denied ever pointing a gun at Jerez-Sosa or threatening him in any way.

. . . .

Jerez-Sosa testified that on the day of the robbery, he had been working as a mechanic in Tacoma when he began experiencing pain in his neck. Jerez-Sosa said that he went to Safeco Field to buy Percocet because "[t]here are people who sell drugs" there. Jerez-Sosa said he saw Santos-Valdez at Safeco Field and knew he sold drugs. Jerez-Sosa testified he had met Santos-Valdez once before "but he was never my friend. And I never lived with him." Jerez-Sosa denied telling Santos-Valdez that he had ever robbed a liquor store or been shot while committing a robbery. Jerez-Sosa denied planning the robbery with Santos-Valdez.

Jerez-Sosa testified that after Santos-Valdez told him they could get drugs on Beacon Hill, they decided to hail a cab. Jerez-Sosa said that when the cab driver parked on Beacon Hill, Santos-Valdez pulled out a gun. According to Jerez-Sosa, Santos-Valdez told the driver to give him his wallet and money and then hit the driver with the gun. Jerez-Sosa testified that Santos-Valdez then pointed the gun at him and said, "And you watch the front. Check, check the front."

Jerez-Sosa testified he had been shot by strangers on two occasions, once in the neck and once in the foot, while walking around in the Central District of Seattle. Jerez-Sosa stated he had nightmares about being shot, and being around guns made him scared and apprehensive. Jerez-Sosa testified he was afraid he would be shot if he did not do what Santos-Valdez said. "When he pointed the gun at me, I had this feeling inside like when one knows that death is coming." Jerez-Sosa testified he grabbed a bag from the front seat of the cab and gave it to Santos-Valdez. Jerez-Sosa testified that he ran away from Santos-Valdez toward the light rail station where he got on a southbound train.

During cross-examination, the State introduced photographs from Valle-Matos' Facebook page taken in 2012. The photographs show Jerez-Sosa, Valle-Matos, and Duanes-Gonzalez posing and smiling with a gun. Jerez-Sosa admitted knowing that Valle-Matos had a gun and that he was having a good time when the photographs were taken.

Dr. Young testified that he interviewed Jerez-Sosa and his stepmother, reviewed the charging document and the police reports, and administered two

> psychological tests. Jerez-Sosa told Dr. Young that he was "shot at random by a stranger" on two separate occasions in 2008. Dr. Young testified that in his opinion, Jerez-Sosa developed PTSD as a result of being shot and was suffering PTSD at the time of the robbery. Dr. Young testified that individuals suffering from PTSD "tend to be jumpy and to have an exaggerated startle reflex if something startles them," and are "wary and vigilant about what's going on around them that they fear might hurt them." Dr. Young testified, in pertinent part:
>
>> For an individual with post-traumatic stress disorder, particular [sic] PTSD stemming from being shot, he would probably be more reactive and more fearful than he would have been without the PTSD. . . . I believe that PTSD renders him more vulnerable to that kind of terrifying moment.
>
> But Dr. Young admitted that if Jerez-Sosa "lied to me or fabricated a story, then – then that line of reasoning would be invalid."

(Dkt. 13, Ex. 17 at 1-10 (emphasis in original) (footnote omitted).)

The jury convicted petitioner of robbery in the first degree, and returned a special verdict finding that petitioner was armed with a firearm at the time of the crime. (*See id*., Ex. 13.) Petitioner was subsequently sentenced to a total term of 126 months confinement, which included a 60 month term for the firearm enhancement. (*See id*.)

Petitioner appealed his judgment and sentence to the Washington Court of Appeals, arguing that the trial court erred by denying a defense motion for mistrial made after Mr. Santos-Valdez testified that petitioner had committed prior robberies in violation of a pretrial evidentiary ruling. (*See id*., Ex. 14.) On August 10, 2015, the Court of Appeals issued an unpublished opinion affirming petitioner's conviction. (*Id*., Ex. 17.) Petitioner subsequently filed a *pro* se petition for review in the Washington Supreme Court. (*See id*., Exs. 18-21.) On March 2, 2016, the Supreme Court denied the petition for review without comment. (*See id*., Ex. 22.) The Court of Appeals issued its mandate terminating direct review on April 1, 2016. (*Id*., Ex. 23.)

On December 9, 2016, petitioner filed a personal restraint petition in the Washington Court of Appeals. Petitioner identified two issues for review in his petition: (1) the state failed to prove that the firearm possessed during the commission of the robbery was operable for purposes of imposing a firearm enhancement; and, (2) trial counsel provided ineffective assistance when he failed to obtain petitioner's medical records related to prior gunshot injuries and when he elicited testimony from Santos-Valdez regarding petitioner's involvement in other robberies. (Dkt. 13, Ex. 24.) The Acting Chief Judge of the Court of Appeals dismissed the petition on March 14, 2017. (*Id*., Ex. 25.)

Petitioner thereafter filed a motion for discretionary review with the Washington Supreme Court, and he raised therein the same claims as were presented to the Court of Appeals in petitioner's personal restraint petition. (*Id*., Ex. 28.) The Commissioner of the Supreme Court denied petitioner's motion for discretionary review on August 18, 2017, and the Court of Appeals issued a certificate of finality in petitioner's personal restraint proceedings on December 8, 2017. (*Id*., Ex. 29.) Petitioner now seeks federal habeas review of his judgment and sentence.

## GROUNDS FOR RELIEF

Petitioner identifies in his federal habeas petition two grounds for relief which may be summarized as follows:

1. Petitioner's right to due process was violated when the state failed to establish that the firearm used during the offense was operable for purposes of the sentence enhancement.

2. Petitioner's right to effective assistance of counsel was violated when petitioner's appointed counsel failed to conduct an adequate investigation of petitioner's medical records to support the duress defense, and when counsel elicited prejudicial testimony regarding unrelated prior robberies.

(Dkt. 6 at 5, 7.)

DISCUSSION

Respondent concedes that petitioner properly exhausted his claims in the state courts. (Dkt. 11 at 6.) Respondent argues, however, that the state courts reasonably rejected petitioner's claims in his personal restraint proceedings. (*See id*. at 10-22.)

Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See Williams*, 529 U.S. at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

In considering a habeas petition, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Sufficiency of the Evidence

Petitioner asserts in his first ground for relief that his due process rights were violated when the state failed to establish that the firearm used by Mr. Valdez-Santos during the commission of the robbery was operable for purposes of imposing a firearm enhancement. (Dkt. 6 at 5.) Respondent argues that viewing the evidence presented at trial in the light most favorable to the state, there was ample circumstantial evidence from which a rational jury could

conclude that the gun brandished by Mr. Valdez-Santos during the robbery was an actual firearm.[1] (*See* Dkt. 11 at 10-15.)

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt each element of the charged offense. *Carella v. California*, 491 U.S. 263, 265 (1989) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). Due process claims challenging the sufficiency of the evidence are evaluated under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979). The Supreme Court explained in *Jackson* that the relevant question in evaluating a claim of insufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. This standard is "'highly deferential' to the jury's findings." *United States v. Bancalari*, 110 F.3d 1425, 1428 (9th Cir. 1997). As the Supreme Court has made clear, it is the responsibility of the jury, and not a reviewing court, to decide what conclusions should be drawn from the evidence admitted at trial. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

The Supreme Court has also made clear that sufficiency of the evidence claims are subject to a second layer of judicial deference on federal habeas review. Specifically, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do

[1] Petitioner asserts in his response to respondent's answer that respondent improperly characterizes his first ground for relief as one challenging the sufficiency of the evidence. It appears that this assertion is merely an attempt by petitioner to avoid the highly deferential standard applicable to sufficiency of the evidence claims on federal habeas review. Nonetheless, the record makes clear that the claim presented to, and decided by, the state courts was a sufficiency of the evidence claim. (*See* Dkt. 13, Ex. 24 at 4-5, Ex. 25 at 1-2, Ex. 28 at 6-7, Ex. 29 at 2-3.) Assuming petitioner did, in fact, intend to present his claim challenging the firearm enhancement to this Court under a different legal theory than was presented to the state courts, the claim would be unexhausted and, thus, not eligible for federal habeas review. This Court will therefore analyze petitioner's first ground for relief as a sufficiency of the evidence claim as that is the only claim that has been properly exhausted.

so only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos*, 565 U.S. at 2).

The state courts rejected petitioner's sufficiency of the evidence claim in his personal restraint proceedings. (*See* Dkt. 13, Exs. 25, 29.) The Commissioner of the Washington Supreme Court, in denying petitioner's motion for discretionary review, explained her conclusion as follows:

> Mr. Jerez-Sosa contends that the evidence does not support the firearm sentencing enhancement because the State failed to show that the firearm used in the crime was capable of firing and therefore was operable as required by RCW 9.41.010. Evidence is sufficient if, when the evidence is viewed in the light most favorable to the State, a rational trier of fact could find the essential elements of the charged offense beyond a reasonable doubt. *State v. Rose*, 175 Wn.2d 10, 14, 282 P.3d 1087 (2012). Under this deferential standard, all reasonable inferences arising from the evidence are drawn in favor of the State and interpreted against the defendant. *Id*. The reviewing court does not review the credibility of witnesses or reweigh the evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). And in determining the sufficiency of the evidence, circumstantial evidence is not considered any less reliable than direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).
>
> Evidence that a device appears to be a real firearm and is wielded during the commission of a crime is sufficient circumstantial proof that the device is an actual firearm as defined by RCW 9.41.010. *State v. Tasker*, 193 Wn. App. 575, 594, 373 P.3d 310, *review denied*, 186 Wn.2d 1013 (2016). At trial Mr. Jerez-Sosa testified that he believed that the firearm brandished by Mr. Santos-Valdez was real. Mr. Jerez-Sosa claimed that he acted in a state of duress, fearful of being shot by the pistol wielded by Mr. Santos-Valdez. Although the jury rejected Mr. Jerez-Sosa's defense of duress, it could validly accept his belief that his accomplice wielded an actual firearm.

(Dkt. 13, Ex. 29 at 2-3.)

Petitioner contends here that testimony that the gun appeared real, or that petitioner feared the gun was real, was not sufficient to establish that the gun was operable. (*See* Dkt. 14 at 4-5.) However, though the state courts, in rendering their decisions in petitioner's personal restraint proceedings, focused on the testimony of petitioner relative to the firearm, Mr. Santos-

Valdez also testified about the gun used during the robbery. Mr. Santos-Valdez engaged in the following exchange with the prosecutor during direct examination:

> Q Okay. . . . I want to ask a little bit about the gun. The gun that you had, who gave that to you?
>
> A The gun, the gun belonged to Oreste.
>
> Q And –
>
> A It was a .40, .40.
>
> Q Okay. And was it a real gun?
>
> A Yes.
>
> Q Okay. And was it a gun that you believed was operable, in other words, that it worked?
>
> A Yeah, yes, it was (indiscernible).
>
> Q And you're familiar with firearms; correct?
>
> A Yes.
>
> Q And you actually used one to kill somebody; is that correct?
>
> A That's correct.

(Dkt. 13, Ex. 2 at 128-29.)

Petitioner's counsel did not challenge this testimony, nor did counsel object when, during closing argument, the prosecutor twice referenced Mr. Santos-Valdez's testimony regarding the gun noting that Mr. Santos-Valdez had told them that the gun was "a real gun and it was loaded" (*id*., Ex. 6 at 482), and that the firearm in the case "was a loaded firearm" (*id*., Ex. 6 at 490). These excerpts from the record reinforce the conclusion of the state courts that there was sufficient proof, under state law, that the gun at issue was an actual firearm.

The state courts applied the appropriate standard in evaluating petitioner's sufficiency of the evidence claim and reasonably concluded that, based upon the evidence presented at trial, a rational trier of fact could find that the gun brandished by Mr. Valdez-Santos during the robbery was an actual firearm. Accordingly, petitioner's first ground for federal habeas relief should be denied.

Ineffective Assistance of Trial Counsel

Petitioner asserts in his second ground for relief that he was denied effective assistance of counsel when trial counsel failed to adequately investigate petitioner's medical records to support his duress defense. (Dkt. 6 at 7.) Petitioner also claims that he was denied effective assistance of counsel when trial counsel elicited testimony regarding petitioner's participation in unrelated and uncharged prior robberies. (*Id.*)

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland*. Under *Strickland*, a defendant must prove (1) that counsel's performance was deficient and, (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id*. at 688. Judicial scrutiny of counsel's performance must be highly deferential. *Id*. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. In order to prevail on an ineffective assistance of counsel claim, a petitioner must overcome the presumption that counsel's challenged actions might be considered sound trial strategy. *Id*.

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component. *Id*. at 697.

While the Supreme Court established in *Strickland* the legal principles that govern claims of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether defense counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S. 101. Rather, when considering an ineffective assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id*.

The Washington Court of Appeals rejected petitioner's ineffective assistance of counsel claim in his personal restraint proceedings. The Court of Appeals explained its conclusion as follows:

> Jerez-Sosa claims that counsel failed to obtain his medical records related to the injuries he suffered when he was shot several years before the crime. He argues that obtaining such records would have strengthened his duress defense

> and would have allowed the expert witness, a psychologist, to provide more "informed testimony." He also claims that counsel performed deficiently in cross-examining the accomplice. He contends that counsel failed to impeach Santos-Valdez with prior inconsistent statements and also elicited prejudicial testimony about his participation in prior robberies.
>
> It was not disputed that Jerez-Sosa had been shot twice within the same year and sustained serious injuries. It [sic] not clear how the medical records Jerez-Sosa provides documenting these injuries would have significantly affected his defense. Jerez-Sosa, as well as the defense expert, testified about how the shooting occurred and about the serious nature of the injuries. The critical testimony supporting the defense was the psychologist's testimony that, in his opinion, Jerez-Sosa suffered from Post-Traumatic Stress Disorder (PTSD) as a result of the shootings, and that as a result, it is likely he would have experienced heightened fear when threatened with a firearm. Jerez-Sosa suggests that the hospital records would have refuted the accomplice's testimony that the shootings occurred during prior robberies. But while the medical records reveal that Jerez-Sosa told medical treatment providers that he was shot in the leg by "bunch of guys" while walking down the street, they also reveal that neither he nor the people who brought him to the hospital would provide any details to hospital staff about the circumstances in which he sustained the gunshot wound to the neck. The medical records do not establish that the prior shootings did not involve robberies.
>
> Nor does the record reflect that counsel was constitutionally deficient with respect to cross examination. It is clear from the record that defense counsel did not deliberately elicit any testimony about Jerez-Sosa's involvement in prior crimes; Santos-Valdez volunteered information about prior robberies in response to questioning by both the prosecutor and defense counsel in violation of a trial court pretrial ruling. The focus of defense counsel's cross examination was the fact that the accomplice had a substantial personal interest in implicating Jerez-Sosa and cooperating with the State because of an unrelated murder charge he was facing. Jerez-Sosa fails to demonstrate that his counsel employed an unreasonable strategy.

(Dkt. 13, Ex. 25 at 2-4.)

The Washington Supreme Court Commissioner likewise rejected petitioner's ineffective assistance of counsel claim in ruling on petitioner's motion for discretionary review:

> It was undisputed that Mr. Jerez-Sosa was shot and seriously injured twice within the same year before the crimes for which he was prosecuted. A psychologist testifying for the defense asserted that Mr. Jerez-Sosa suffered from

> posttraumatic stress disorder as a result of the shootings, and that therefore it was likely he would have experienced heightened fear when threatened with a firearm. Mr. Jerez-Sosa claims medical testimony would have refuted Mr. Santos-Valdez's testimony that Mr. Jerez-Sosa was shot during previous robberies. But the medical records proffered by Mr. Jerez-Sosa do not conclusively establish that the previous shootings did not involve robberies, particularly a shooting that wounded him in the neck. In other words, the medical records had little to no probative value. Thus, even if defense counsel should have attempted to introduce the medical records, and assuming the records would have been admitted (which I need not decide), Mr. Jerez-Sosa cannot establish prejudice under these facts.
>
> As for cross-examination, defense counsel competently attempted to show that Mr. Santos-Valdez had a strong personal interest in implicating Mr. Jerez-Sosa and cooperating with the State because of an unrelated murder charge Mr. Santos-Valdez was then facing. Defense counsel did not deliberately elicit information about previous robberies; rather, Mr. Santos-Valdez volunteered the information in violation of a pretrial ruling, first in response to questions from both the prosecutor on direct examination and then improperly volunteering more information in cross-examination. Defense counsel moved for a mistrial, which the trial court denied, but the court gave an appropriate limiting instruction. Defense counsel's handling of cross-examination was not deficient under these circumstances, and even if it was, Mr. Jerez-Sosa shows no prejudice in light of the entire record.

(Dkt. 13, Ex. 29 at 3-4.)

With respect to the first part of petitioner's ineffective assistance of counsel claim, that pertaining to counsel's failure to obtain medical records, the state courts' decisions appear to be based, at least in part, on an inaccurate reading of the record. Both the Washington Court of Appeals and the Washington Supreme Court begin their analyses by announcing that it was "undisputed" that petitioner was shot and seriously injured twice in the same year. The record does not bear this out.

The transcript of petitioner's trial confirms that petitioner testified he had been shot twice in 2008, and that he was treated at Harborview Medical Center on both occasions. (*See* Dkt. 13, Ex. 5 at 283-84, 336-37.) Dr. Young, the forensic psychologist who testified on petitioner's behalf, also testified that petitioner had been shot on two occasions, though Dr. Young

apparently understood that the two shootings occurred some years apart. (*See* Dkt. 13, Ex. 5 at 363, 399-400.) On cross-examination, the prosecutor inquired of Dr. Young whether he had made any effort to obtain medical records in order to confirm that petitioner's story about being shot in 2008 was true. (*See id*., Ex. 5 at 398-99.) Dr. Young acknowledged that he had made no such effort, and that his knowledge and understanding of the shootings was based primarily on what petitioner had told him. (*See id*., Ex. 5 at 396-99.)

During closing argument, the prosecutor, in discussing the testimony of Dr. Young, emphasized that Dr. Young "relied almost exclusively on self-reporting" in reaching his conclusions. (*See id*, Ex. 6 at 480-81.) The prosecutor then went on to argue as follows:

> Now, there's different stories that the Defendant told about how he was shot, purportedly shot. Again, we have no records to show that. You heard the doctor say that he often relies on medical records in his opinion. Did he get any? Did he ask for any? Did he go to Harborview and try to get them? Were they provided to him? Did he look at any other records that he could get? Nothing.

(*Id*., Ex. 6 at 481.) Given the cross-examination of Dr. Young, and the portion of the state's closing argument quoted above, the state courts' conclusion that there was no dispute about whether petitioner was shot and seriously injured twice in the same year is somewhat puzzling.

This Court also questions whether the state courts' characterization of petitioner's claim as one alleging that the medical records would have refuted Mr. Santos-Valdez's testimony that the shootings occurred during prior robberies is entirely accurate. Petitioner's submissions to the state courts in his personal restraint proceedings were somewhat confusing, especially petitioner's motion for discretionary review. However, this Court's review of petitioner's briefs suggests that petitioner's intended claim was not that the medical records would have established that the prior shootings did not occur during robberies, but that they would have provided proof

that petitioner had, in fact, been shot on prior occasions and that the trauma associated with those prior events was significant.[2] (*See* Dkt. 13, Exs. 24, 28.)

Assuming that the state courts properly construed petitioner's claim as one asserting that the medical records would have refuted Mr. Santo-Valdez's testimony that petitioner was shot during previous robberies, the state courts reasonably concluded that the failure to obtain the records did not result in any prejudice because, indeed, those records did not establish that the prior shootings did not involve robberies. (*See id*., Ex. 24 at Ex. A.) Even if, as it appears to this Court, the state courts slightly misconstrued petitioner's argument regarding the medical records, and misread or misunderstood the record as it related to the prior shootings, their conclusions that counsel's failure to obtain the medical records did not constitute ineffective assistance were nonetheless reasonable.

The medical records, which were attached to petitioner's personal restraint petition and are a part of the record before this Court, confirm the fact that petitioner was shot twice in 2008, and that he suffered significant injuries, especially with respect to the gunshot to his neck. (*See* Dkt. 13, Ex. 24, Ex. A.) It seems unlikely that those records would have been admitted at trial and, thus, would only have permitted Dr. Young to testify that the records confirmed what petitioner and his step-mother had already told him regarding the prior injuries. While this confirmation may, arguably, have leant some additional credibility to Dr. Young's conclusion that petitioner suffered from PTSD as a result of prior shootings, it's not likely that the medical

[2] Petitioner did argue in his motion for discretionary review that "an investigation would of [sic] reveled [sic] Sosa's injuries were not due to criminal activity." (*See* Dkt. 13, Ex. 28 at 8.) However, it is not clear that petitioner was referring specifically to the medical records in making that argument. It appears that petitioner was arguing that a more thorough investigation, generally, would have revealed evidence which counsel could have used to rebut Mr. Santos-Valdez's testimony that petitioner was shot during prior robberies. However, petitioner's counsel successfully moved pretrial to exclude evidence regarding petitioner's prior robberies. The suggestion that counsel was constitutionally deficient for failing to better prepare to rebut testimony which should not have come in in the first place lacks merit.

records would have been a game-changer. Given the testimony of other witnesses demonstrating that petitioner was an active and willing participant in the robbery, and given the absence of any concrete evidence that Mr. Valdez-Sosa actually threatened petitioner with a gun, there is no reasonable probability that the medical records alone would have altered the outcome of petitioner's trial.

With respect to the second portion of petitioner's ineffective assistance of counsel claim in which petitioner asserts that trial counsel elicited prejudicial testimony regarding unrelated, uncharged prior robberies, the state courts reasonably concluded that petitioner had shown neither deficient performance nor prejudice. Petitioner's counsel moved pretrial to exclude evidence of any other alleged crimes petitioner may have been involved in and the trial court granted that motion, at least with respect to the state's case in chief. (*See* Dkt. 13, Ex. 1 at 15-17.) Despite that ruling, and the prosecutor's on-the-record directive to Mr. Santos-Valdez immediately prior to his testimony that he was not to volunteer any evidence about other robberies or other crimes petitioner may have been involved in (*see id*., Ex. 2 at 119), Mr. Santos-Valdez twice referred to prior robberies in his testimony, once on direct examination and once on cross-examination (*see id*., Ex. 5 at 126, 153.)

The record makes clear that petitioner's trial counsel did not deliberately elicit testimony from Mr. Santos-Valdez regarding previous robberies, Mr. Santos-Valdez volunteered the information in violation of the pretrial ruling.[3] Trial counsel subsequently moved for a mistrial, which was denied, but the trial court did give a limiting instruction. (*See id*., Ex. 3 at 174-90, Ex. 4 at 201-02.) This Court concurs with the state courts that, under these facts, petitioner has

[3] Trial counsel asked Mr. Santos-Valdez "Okay. You knew my client had been shot in the past; right? He's got a mark on his neck where he's been shot." (Dkt. 13, Ex. 2 at 153.) Mr. Valdez-Santos responded "From committing robberies, yes." (*Id*.)

shown neither deficient performance nor prejudice. Petitioner thus fails to demonstrate any entitlement to relief with respect to the second portion of his ineffective assistance of counsel claim, and petitioner's second ground for federal habeas relief should therefore be denied in its entirety.

Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his petition for writ of habeas corpus.

CONCLUSION

For the reasons set forth above, this Court recommends that petitioner's petition for writ of habeas corpus be denied and this action be dismissed with prejudice. This Court further recommends that a certificate of appealability be denied. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **April 19, 2018**. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for

consideration on the District Judge's motion calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 20, 2018.**

This Report and Recommendation is not an appealable order. Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

DATED this 29th day of March, 2018.

James P. Donohue

JAMES P. DONOHUE
United States Magistrate Judge